# Syllabus

Chief Justice:
Bridget M. McCormack

Justices:
Brian K. Zahra
David F. Viviano
Richard H. Bernstein
Elizabeth T. Clement
Megan K. Cavanagh
Elizabeth M. Welch

**This syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader.**

Reporter of Decisions:
Kathryn L. Loomis

## PEOPLE v DAVIS

Docket No. 161396. Argued on application for leave to appeal November 10, 2021. Decided March 14, 2022.

Donald W. Davis, Jr., was convicted following a jury trial in the Genesee Circuit Court of multiple felonies in connection with the shooting death of Devante Hanson. During a recess on the second day of the trial, the mother of the victim's child made contact with a juror in the hallway. When the trial resumed, the court, Geoffrey L. Neithercut, J., ordered the woman and all other spectators, with the exception of the victim's mother, removed from the courtroom and directed them not to return for the remainder of the trial. After his conviction, defendant appealed and moved to remand for an evidentiary hearing, arguing that he had been denied his constitutional right to a public trial and that his trial counsel had been ineffective for failing to object to the closure of the courtroom. The Court of Appeals granted the motion. On remand, following the evidentiary hearing, the trial court denied defendant's motion for a new trial, stating that it had not actually closed the courtroom to the public and that the doors were never locked. In addition, the court concluded that while it had poorly worded its directive to the spectators not to return during the trial, defendant was not prejudiced by the removal because no one supporting defendant had been affected by the removal order. The Court of Appeals, MARKEY, P.J., and REDFORD, J. (SWARTZLE, J., concurring in part and dissenting in part), affirmed, stating that the courtroom had been "cleared" rather than closed, that defendant had waived his right to a public trial when defense counsel failed to object to the clearing of the courtroom, and that even if the courtroom had been closed and the error had been forfeited rather than waived, defendant would not have been entitled to relief because any error in this regard would not have warranted reversal. 331 Mich App 699 (2020). Defendant applied for leave to appeal, and the Supreme Court ordered and heard oral argument on whether to grant the application or take other action. 507 Mich 853 (2021).

In an opinion by Justice CLEMENT, joined by Chief Justice MCCORMACK and Justices VIVIANO, BERNSTEIN, CAVANAGH, and WELCH, the Supreme Court, in lieu of granting leave to appeal, *held*:

The trial court's closure of the courtroom for nearly the entirety of defendant's trial after a single, benign interaction between an observer and a juror constituted plain error. Because the deprivation of a defendant's public-trial right is a structural error, the error necessarily affected defendant's substantial rights. This structural error presumptively satisfied the plain-error

standard's requirements for reversal, and neither the prosecution's arguments nor the record evidence rebutted that presumption. The Court of Appeals judgment was reversed, and the case was remanded to the trial court for a new trial.

1. Appellate review was not precluded on the ground that defendant had waived the argument regarding the closure of the courtroom by failing to object. In order to waive a known right, a party must clearly express satisfaction with a trial court's decision, which defense counsel did not do in this case. The Court of Appeals erred by considering defense counsel's posttrial statements at the evidentiary hearing to supplement defense counsel's silence at trial to conclude that the issue had been waived rather than forfeited. A failure to object—even when purposeful or strategic—does not constitute the clear, outward expression of satisfaction with a trial court's decision that is necessary to find waiver, and defense counsel's testimony detailing his motivation behind the lack of objection, elicited months after trial when defense counsel was no longer representing defendant, did not retroactively transform defense counsel's silence into an affirmative approval. Further, after the trial, a defense counsel's interests are no longer necessarily aligned with those of the defendant and defense counsel may no longer make decisions on the defendant's behalf. Accordingly, an attorney's posttrial testimony about the reason for a lack of objection cannot retroactively transform the forfeiture of a client's right at trial into a waiver of the same.

2. The United States Constitution and the Michigan Constitution guarantee a criminal defendant the right to a public trial. This right allows the public to see that a defendant is fairly dealt with and not unjustly condemned, reminds defendant's triers of their responsibility and the importance of their functions, helps ensure that judges and prosecutors fulfill their duties ethically, encourages witnesses to come forward, and discourages perjury. However, a courtroom may be closed during any stage of a criminal proceeding if there is an overriding interest that is likely to be prejudiced, if the closure is no broader than necessary to protect that interest, and if the trial court has considered reasonable alternatives to closing the proceeding and made findings adequate to support the closure.

3. The trial court and the Court of Appeals clearly erred by finding that the courtroom was not closed to the public. The trial court ordered everyone in the gallery to leave the courthouse and not come back, told the observers that they were not allowed to return for the remainder of the trial, and stated that the only person allowed to watch the trial was the victim's mother. The trial court's posttrial interpretation of this oral order as a temporary "clearing" of the courtroom ignored its own explicit instruction that the observers were not allowed to return for the remainder of trial, not just the remainder of that particular day. Even accepting as true the trial court's posttrial assertions that it did not lock the courtroom or eject any observers during the remainder of trial, the trial court's failure to enforce or otherwise effectuate the order did not undo it. The observers who were removed from the courtroom on the day of the order were directed not to return for the remainder of the trial, and they did not. It was not necessary for the trial court to have ejected potential observers or taken actions to bar entry of potential observers to find that a closure order was in place.

4. When preserved, the erroneous denial of a defendant's public-trial right is considered a structural error that defies analysis by harmless-error standards and results in automatic relief to

the defendant. When such an error is forfeited, a defendant must prove that error occurred, that the error was plain, and that the plain error affected substantial rights. Reversal is warranted only when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error seriously affected the fairness, integrity or public reputation of judicial proceedings independent of the defendant's innocence.

5. The trial court's decision to close the courtroom was plain error. The observer's prohibited interaction with the juror implicated the impartiality of the jury, and given defendant's constitutional right to be tried by an impartial jury, preventing interference with the jury was an overriding interest that the trial court was justified in attempting to safeguard. However, the closure was broader than necessary to protect the impartiality of the jury, the trial court failed to consider reasonable alternatives to closing the proceeding, and the trial court failed to make adequate factual findings to support the closure. The trial court's failure to comply with these requirements constituted plain error, given that these requirements are well established and the trial court's failure to comply with them was readily apparent from the record.

6. The trial court's plain error in closing the courtroom affected defendant's substantial rights. Because structural errors such as this affect the framework within which the trial proceeds rather than a single piece of evidence or aspect of the trial, the harm they cause is substantial but often difficult to quantify, and they are thus particularly ill-suited to an analysis of whether the error affected the outcome of the trial court proceedings. The United States Supreme Court has held that structural errors involve constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error and that the proper remedy for a preserved structural error is automatic reversal. The Michigan Supreme Court has previously suggested that structural errors satisfy the third prong of the plain-error standard. The harmless-error and plain-error standards require the same kind of inquiry because they both require appellate courts to assess the effect of the error on the outcome of the trial court proceedings. Just as preserved structural errors defy analysis by harmless-error standards, forfeited structural errors defy analysis under the third prong of the plain-error standard. Because structural errors often render a trial fundamentally unfair and an unreliable vehicle for determining guilt or innocence and also affect the framework within which the trial proceeds, they necessarily affect a defendant's substantial rights. Therefore, the existence of a forfeited structural error alone satisfies the third prong of the plain-error standard, and a defendant need not also show the occurrence of outcome-determinative prejudice. Because the deprivation of the public-trial right is a structural error, defendant satisfied the third prong of the plain-error standard.

7. The fourth prong of the plain-error standard requires consideration of whether the error seriously affected the fairness, integrity or public reputation of judicial proceedings independent of the defendant's innocence. A forfeited structural error creates a formal presumption that this prong of the plain-error standard has been satisfied. A trial that has been rendered fundamentally unfair or had its framework affected by structural error is generally one whose fairness, integrity, or public reputation has been damaged. Given this conceptual overlap between the third and fourth prongs of the plain-error standard and that a forfeited structural error automatically satisfies the third prong of the plain-error standard, a forfeited structural error is very likely to also satisfy the fourth prong of the plain-error test. Recognizing a formal rebuttable presumption creates a better framework for future courts applying the plain-error standard to forfeited structural errors. Just as

defendants face difficulty in proving prejudice from structural errors, they also face difficulty in identifying specific facts on the record showing that the forfeited structural error seriously affected the fairness, integrity, or public reputation of the trial. The formal rebuttable presumption in cases of forfeited structural error will shift the burden of demonstrating that the error did not seriously affect the fairness, integrity, or public reputation of the judicial proceeding to the prosecution, which is better positioned to marshal record facts supporting the overall fairness of the trial proceedings.

8. The denial of defendant's public-trial right, as a structural error, presumptively establishes that the error had a serious effect on the fairness, integrity, or public reputation of the trial. The prosecution did not rebut this presumption with its argument that the closure reduced the perception that the gallery supported the victim while defendant had no supporters in attendance. The public-trial right does not serve only defendant's interest in the presence of community support; rather, the existence of public observers, no matter their affiliation, helps to ensure a fair trial, to ensure that attorneys and judges do their jobs responsibly, to encourage witnesses to come forward, and to discourage perjury. Further, the prosecution's focus on the supposed absence of harm to defendant himself failed to consider the harm rendered to the integrity and public reputation of the trial. Having satisfied the plain-error standard, defendant is entitled to relief.

Reversed and remanded for a new trial.

Justice ZAHRA, concurring in the result only, agreed that the closure of the courtroom for the majority of defendant's trial violated his constitutional right to a public trial and amounted to plain structural error warranting reversal. He disagreed, however, with the majority's decision to modify the existing plain-error standard for reviewing unpreserved structural errors on its own initiative and with no warning to the bench and the bar, notwithstanding the Court's prior precedent rejecting the rule that the majority adopted. He stated that the majority opinion's framework erodes the preservation standard by undermining the reasons for requiring errors to be preserved for appellate review, which are to allow trial courts the opportunity to correct the error, to prevent the administrative and social costs of further proceedings that could have been avoided with a timely objection, and to deter defendants and their counsel from harboring error as an appellate parachute. He further noted that the majority need not have adopted a new standard in order to provide relief in this case given that defendant could demonstrate that he was entitled to a reversal under all four prongs of the current plain-error standard.

# OPINION

Chief Justice:
Bridget M. McCormack

Justices:
Brian K. Zahra
David F. Viviano
Richard H. Bernstein
Elizabeth T. Clement
Megan K. Cavanagh
Elizabeth M. Welch

FILED March 14, 2022

STATE OF MICHIGAN

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v                            No. 161396

DONALD WAYNE DAVIS, JR.,

      Defendant-Appellant.

_____

BEFORE THE ENTIRE BENCH

CLEMENT, J.

At issue in this case is whether defendant, Donald W. Davis, Jr., was deprived of his constitutional right to a public trial. After a benign interaction between a courtroom observer and a juror on the second day of trial, the trial court removed all but one observer from the courtroom, instructed the removed observers not to return, and stated that the courtroom would be closed for the remainder of trial. Although the trial court did not take

any further action to effectuate this closure, we hold that the unjustified closure nonetheless violated defendant's public-trial right and constituted plain error requiring reversal.

## I. FACTS AND PROCEDURAL HISTORY

This case arises from the murder of Devante Hanson. In 2016, a security guard found Hanson's body in the driver's seat of a running car parked outside an apartment complex. Hanson had been shot to death. On the basis of surveillance-camera footage, defendant and Spencer Holiday were identified as the parties who might have been responsible for Hanson's death. As part of a plea deal, Holiday testified against defendant at trial. According to Holiday, defendant lured Hanson to the apartment complex by offering to purchase marijuana from Hanson, but actually intended to rob Hanson. When defendant and Holiday entered Hanson's vehicle, defendant brandished a gun at Hanson and demanded money and marijuana. Hanson reached for defendant's gun, and defendant fatally shot him. Defendant then demanded at gunpoint that Holiday shoot Hanson as well, and Holiday complied.

The prosecutor charged defendant with first-degree murder, based on alternate theories of premeditated murder and felony murder.[1] On the second day of trial, the trial court became aware that a courtroom observer had spoken to a juror during a break in the proceedings. The trial court identified the courtroom observer as Daundria Frye, who explained that she was attending the trial because Hanson was the father of her child. The following exchange then took place:

---

[1] The prosecutor also charged defendant with assault with intent to commit armed robbery, being a felon in possession of a firearm, being a felon in possession of ammunition, and four counts of carrying a firearm during the commission of a felony.

> *The Court*:  So you know, counselors, the jury has complained that that woman has tried to talk to them.
>
> *Ms. Frye*:  No.  I didn't try to talk, I just saw a lady and I asked—I'm like did you—do you work at Hurley's?  I know I'm not supposed to talk to them.
>
> *The Court*:  I've got two choices.  One is to find you in contempt of court and lock you up.
>
> *Ms. Frye*:  [Are] you serious?
>
> *The Court*:  I'm serious.  The other is to order everyone in the gallery to leave the courthouse and not come back.  What we're going to do is this; in order to lock you up I'd have to get you a lawyer first and that wastes time because we have things to do here.  So instead, I'm going to bar everyone from this courthouse except for the mother of Devante [Hanson].  The rest of you leave.  Don't you come back.
>
> *Ms. Frye*:  Okay.
>
> *The Court*:  Shame on you trying to subvert the justice system.

Shortly thereafter, a person unidentified in the trial transcript sought clarification of the trial court's verbal order:

> *Unidentified Speaker*:  Judge, you did mean for the remainder of the trial correct?
>
> *The Court*:  For the remainder of the trial, all the way in to next week.
>
> *Unidentified Speaker*:  All right.
>
> *The Court*:  The only person allowed to watch this trial is the mother of the young man who died.  What foolishness.

The prosecutor asked the trial court whether the "jurors who have a complaint" regarding the interaction with Frye should be questioned to determine whether they were prejudiced by the interaction.  The trial court responded that this was not necessary, reasoning that

Frye had merely asked one juror whether that juror worked at Hurley Hospital and that this interaction was merely "a short comment."

The trial continued, and, over the course of several days, the jury heard from 14 additional witnesses, including the key testimony from Holiday described above. Ultimately, the jury found defendant guilty as charged.

Defendant appealed by right in the Court of Appeals, and he included in his appeal a motion to remand for an evidentiary hearing and to allow him the opportunity to file a motion for a new trial based on a variety of issues. The Court of Appeals granted this motion in part, ordering a remand for the sole purpose of "expand[ing] the factual record regarding [the trial court's] decision to close the trial to all members of the public except for the victim's mother, and to allow defendant to file a motion for new trial based on his claim that trial counsel was ineffective for failing to object to the court's decision." *People v Davis*, unpublished order of the Court of Appeals, entered November 13, 2018 (Docket No. 343432).

On remand, testimony was elicited regarding the factual circumstances of the courtroom closure. Defense counsel testified that, before the courtroom closure, there were between 3 and 10 people observing the trial on the side of the prosecution, and no observers on defendant's side.[2] After the closure, only the decedent's mother and an employee from the prosecutor's office remained in the gallery. Defense counsel also testified that he did not know of any members of the public who tried to view the trial but were stopped, that

_____

[2] Defense counsel acknowledged on redirect examination that it was never made clear to the jury that there was a defense side and a prosecution side of the courtroom.

4

he did not recall there being a sign on the door telling people the trial was closed, and that he did not believe there was a deputy posted outside the courtroom to stop people from entering.[3]

Defendant's sister testified that she came to the courthouse during the trial and found the courtroom door locked, but she was unsure whether her attempted entry occurred during a break in the proceedings.[4] She returned the next day but left before entering the courtroom after feeling threatened by the decedent's family.

Finally, Bryan Wooten, who attempted to view the trial in support of defendant, also testified. He stated that there was no sign at the courtroom door indicating that he could not enter, and Wooten was able to enter the courtroom without interference from the courtroom deputy. However, after he entered, defendant gestured toward the door and indicated that Wooten should leave, and Wooten did so.[5]

---

[3] Defense counsel also testified regarding his decision not to object to the trial court's decision to close the courtroom. Defense counsel explained that when the trial court made its decision, none of the trial observers was there to support defendant. When asked whether "it was actually better to only have the victim's mother here as opposed to having a large group of people," defense counsel answered, "Absolutely."

[4] She testified that she arrived at 1:30 p.m., which was during the period in which the court was in recess.

[5] The record does not reflect the reason for defendant's gesture, and, on appeal, the parties have put forth competing arguments regarding the basis behind this gesture. Defendant argues that he asked Wooten to leave to comply with the courtroom closure order; the prosecutor argues that defendant's request was based instead on defendant's desire that Wooten not observe the trial.

After evaluating this testimony, the trial court denied defendant's motion for a new trial. The court reasoned that it had not actually closed the courtroom, explaining as follows:

> But I did not lock the courtroom, I did not close it to the public, I just kicked out three to ten people. And I admit I poorly worded it because I said don't come back and I probably should have said don't come back today. That's my error.

The trial court also determined that defendant had not suffered prejudice from this clearing of the courtroom, reasoning that there was no evidence that defense supporters were cleared from the courtroom or later prevented from observing the trial.

Defendant appealed, and the Court of Appeals affirmed in a split, published decision. The majority succinctly agreed with the trial court that the courtroom had been "cleared," not closed. Further, the majority held that defendant had waived his right to a public trial when defense counsel intentionally—according to his hearing testimony— declined to object to the trial court's clearing of the courtroom. In the alternative, if the trial court's order was instead understood to be a closure and defendant was deemed to have forfeited, rather than intentionally waived, the argument, the Court held that defendant would still not have been entitled to relief because he could not have satisfied the plain-error standard. Specifically, defendant could not have demonstrated that the courtroom closure seriously affected the fairness, integrity, or public reputation of the judicial proceedings because the effect of the courtroom closure was merely to limit the presence of observers supporting the prosecution. Because no observers supporting defendant were removed or prevented from observing the trial, the courtroom closure was to defendant's

6

benefit, and he was not entitled to relief. *People v Davis*, 331 Mich App 699; 954 NW2d 552 (2020).[6]

Defendant subsequently applied for leave to appeal in this Court, and we ordered oral argument on the application on the following issues:

> (1) whether [defendant] was denied his right to a public trial pursuant to US Const, Am VI, and Const 1963, art 1, § 20 where the Genesee Circuit Court stated that it was barring everyone, but the decedent's mother, from the courtroom for the remainder of the trial and told others in the courtroom to leave and not return; (2) whether, despite the court's statement, the courtroom remained open to the public because the courtroom door was unlocked, no sign was posted advising members of the public that the courtroom was closed, and court personnel did not prevent persons from entering the courtroom; (3) whether the appellant waived his right to a public trial; (4) whether trial counsel rendered ineffective assistance in failing to object; see *Weaver v Massachusetts*, 582 US ___; 137 S Ct 1899, 1913 (2017); and (5) whether the trial court committed plain error entitling the appellant to a new trial. [*People v Davis*, 507 Mich 853 (2021).]

## II. ANALYSIS

### A. WAIVER AND FORFEITURE

As a threshold issue, the prosecutor argues that defendant has waived this argument and that, accordingly, appellate review is precluded. We disagree. Waiver is " 'the intentional relinquishment or abandonment of a known right,' " and one who waives an

---

[6] Judge SWARTZLE, concurring in part and dissenting in part, would have held that defendant satisfied the plain-error standard and, accordingly, was entitled to a new trial. Regarding the fourth prong of the plain-error standard, Judge SWARTZLE determined that the closure seriously affected the fairness, integrity, and reputation of the judicial proceedings because a majority of defendant's trial—the testimony of 14 witnesses, closing arguments, and the rendering of the verdict—was not subject to public view. He reasoned that the public-trial right serves several interests beyond demonstrating community support for a defendant or a prosecution and that defendant was denied these benefits without sufficient justification.

issue cannot later seek appellate review of that issue. *People v Carines*, 460 Mich 750, 752 n 7; 597 NW2d 130 (1999), quoting *United States v Olano*, 507 US 725, 733; 113 S Ct 1770; 123 L Ed 2d 508 (1993) (some quotation marks omitted). In order to waive a known right, a party must "clearly express[] satisfaction with a trial court's decision . . . ." *People v Kowalski*, 489 Mich 488, 503; 803 NW2d 200 (2011). In contrast, a party merely forfeits rather than waives an issue when that party fails to timely assert a right. *Id*. at 504 n 27.

As applied to the public-trial right, this Court has held that mere silence in the face of a courtroom closure results in forfeiture, not waiver, of the public-trial right. *People v Vaughn*, 491 Mich 642, 663-664; 821 NW2d 288 (2012). Similarly, here, defense counsel did not object to the courtroom closure, but also did not "clearly express[] satisfaction" with the closure, so the alleged error was forfeited. *Kowalski*, 489 Mich at 503.

In so holding, we reject the Court of Appeals' use of defense counsel's posttrial statements at the evidentiary hearing to supplement defense counsel's silence at trial and its resultant conclusion that the issue was waived rather than forfeited. The failure to object—even when purposeful or strategic—does not constitute the clear, outward expression of satisfaction with a trial court's decision that is necessary to find waiver. See *Vaughn*, 491 Mich at 663-664. And defense counsel's testimony detailing his motivation behind the lack of objection, elicited months after trial when defense counsel was no longer representing defendant, does not retroactively transform defense counsel's silence into an affirmative approval. Eliciting testimony from defense counsel regarding his motivations for not objecting at trial is not the same as defense counsel's waiving an issue at trial on behalf of his client. Further, the majority's analysis ignores the reality that, posttrial,

8

defense counsel's interests are no longer necessarily aligned with those of the defendant and that defense counsel may no longer make decisions on behalf of the defendant. It places defendants who seek posttrial evidentiary hearings in an unequal position with those defendants who do not, as the former risk having their arguments deemed waived and prohibited from appellate review by virtue of their defense counsel's testimony at the hearing, whereas the latter class of defendants is not exposed to such a risk. Accordingly, an attorney's posttrial testimony as to the reason for the attorney's lack of objection cannot retroactively transform the forfeiture of a client's right at trial into a waiver of the same.

## B. THE PUBLIC-TRIAL RIGHT

Having determined that defendant has not waived this argument, we must now consider whether the alleged courtroom closure violated defendant's right to a public trial. Both the United States Constitution and the Michigan Constitution guarantee a criminal defendant the right to a public trial. US Const, Am VI; Const 1963, art 1, § 20. "The requirement of a public trial is for the benefit of the accused; that the public may see he is fairly dealt with and not unjustly condemned, and that the presence of interested spectators may keep his triers keenly alive to a sense of responsibility and to the importance of their functions . . . ." *Gannett Co v DePasquale*, 443 US 368, 380; 99 S Ct 2898; 61 L Ed 2d 608 (1979) (quotation marks and citations omitted). The public-trial right also helps ensure that judges and prosecutors fulfill their duties ethically, encourages witnesses to come forward, and discourages perjury. *Vaughn*, 491 Mich at 667.

Despite serving these important interests, the public-trial right is not unlimited, and circumstances may exist that warrant the closure of a courtroom during any stage of a

9

criminal proceeding. *Id*. at 653. In order to justify a courtroom closure, there must be "an overriding interest that is likely to be prejudiced, the closure must be no broader than necessary to protect that interest, the trial court must consider reasonable alternatives to closing the proceeding, and it must make findings adequate to support the closure." *Id*. at 653, quoting *Waller v Georgia*, 467 US 39, 48; 104 S Ct 2210; 81 L Ed 2d 31 (1984) (quotation marks omitted).

## 1. STANDARD OF REVIEW

When preserved, the erroneous denial of a defendant's public-trial right is considered a structural error. *Weaver v Massachusetts*, 582 US ___, ___; 137 S Ct 1899, 1908; 198 L Ed 2d 420 (2017). Structural errors "are structural defects in the constitution of the trial mechanism, which defy analysis by 'harmless-error' standards." *Arizona v Fulminante*, 499 US 279, 309; 111 S Ct 1246; 113 L Ed 2d 302 (1991). Because the harm rendered by these errors is extensive but intrinsic and difficult to quantify, preserved structural errors result in automatic relief to the defendant to "ensure insistence on certain basic, constitutional guarantees that should define the framework of any criminal trial." *Weaver*, 582 US at ___; 137 S Ct at 1907.

Although preserved structural errors are subject to automatic reversal, the alleged error here was forfeited.[7] In order to receive relief on a forfeited claim of constitutional error, a defendant must prove that (1) error occurred, (2) the error "was plain, i.e., clear or

_____

[7] Although the term "structural error" was coined in the context of preserved claims of errors exempt from the harmless-error standard, for brevity's sake, and for the sake of the bench and bar moving forward, we will also use the term "structural error" to include the same type of errors, even when unpreserved.

obvious," and (3) "the plain error affected substantial rights." *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). Further, "[r]eversal is warranted only when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error seriously affected the fairness, integrity or public reputation of judicial proceedings independent of the defendant's innocence." *Id*. (quotation marks, brackets, and citation omitted). However, as discussed later in this opinion, there are special considerations relevant to this analysis when a forfeited structural error is at issue.

Finally, we review a trial court's factual findings for clear error. *Vaughn*, 491 Mich at 650. "Clear error exists when the reviewing court is left with the definite and firm conviction that a mistake has been made." *People v Kurylczyk*, 443 Mich 289, 303; 505 NW2d 528 (1993) (opinion of GRIFFIN, J.).

## 2. FACTUAL ISSUE OF CLOSURE

To begin, we disagree with the lower courts' finding that the courtroom was not closed to the public.

Here, the trial court ordered "everyone in the gallery to leave the courthouse and not come back."[8] And it further specified that the observers were not allowed to return "[f]or the remainder of the trial, all the way in to next week" and that "[t]he only person allowed to watch this trial is the mother of the young man who died." There is no ambiguity in this language: The trial court had ordered the courtroom closed to all observers except Hanson's

---

[8] The court made an exception for Hanson's mother, whose presence was expressly permitted by statute. MCL 780.761; MCL 780.752(1)(m)(*ii*)(C).

mother for the remainder of the trial. We are "left with a definite and firm conviction" that the trial court was mistaken in concluding otherwise. *Kurylczyk*, 443 Mich at 303.

The trial court's posttrial interpretation of this oral order as a temporary "clearing" of the courtroom ignores its own explicit instruction that the observers were not allowed to return for the remainder of trial, not just the remainder of that particular day.[9] Moreover, even accepting as true the trial court's posttrial assertions that it did not lock the courtroom or eject any observers during the remainder of trial, the trial court's failure to enforce or otherwise effectuate the order does not undo it.[10] The observers who were removed from the courtroom on the day of the order were directed not to return for the remainder of the trial, and they did not. The parties understood that no observers would be allowed for the

---

[9] Specifically, at the close of the evidentiary hearing, the trial court stated, "I admit I poorly worded [the order] because I said don't come back and I probably should have said don't come back today," but the trial court actually directed the observers not to return "[f]or the remainder of the trial."

[10] While the Court of Appeals found that the courtroom was not closed, it proceeded in the alternative with a plain-error analysis as follows:

> The trial court stated that it did not actually close the courtroom to the public and that the doors were never locked, and no one was ejected from the courtroom after Frye and the victim's other supporters were ejected. We decline to call into question the highly respected jurist's credibility, so we shall proceed with our analysis on the *assumption* that the courtroom was closed for the remainder of the trial. [*People v Davis*, 331 Mich App at 712 n 1.]

There are established standards for reviewing the trial court's findings of fact and conclusions of law, and none of these standards involves an assessment of the presiding judge's professional reputation. See *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002). The presence of legal error does not depend on a jurist's respectability, and to the extent that the Court of Appeals adopted the trial court's rulings and findings of fact on that basis, it erred.

12

remainder of the trial, and the trial court did not later advise them otherwise. We do not require the trial court to have ejected potential observers or taken actions to bar entry of potential observers to find that a closure order was in place. Such requirements would expose potential observers to the risk of being held in contempt of court for violating the previously rendered closure order. It would also treat defendants inequitably on the basis of the level of community interest in their prosecution, as those whose cases lack potential interested observers would be unable to meet this standard.

In sum, pursuant to the plain language of the trial court's verbal order, we find that the trial court's order rendered the courtroom closed to the public for a majority of the trial.

### 3. APPLICATION OF THE PLAIN-ERROR STANDARD

Having found that the courtroom was factually closed, we hold that the decision to close the courtroom was plain error.

### a. PLAIN ERROR OCCURRED

As discussed, to justify a courtroom closure, there must be "an overriding interest that is likely to be prejudiced, the closure must be no broader than necessary to protect that interest, the trial court must consider reasonable alternatives to closing the proceeding, and it must make findings adequate to support the closure." *Vaughn*, 491 Mich at 653, quoting *Waller*, 467 US at 48 (quotation marks omitted). Here, Frye's prohibited interaction with the juror implicated the impartiality of the jury. Given defendant's constitutional right to be tried by an impartial jury, US Const, Am VI; Const 1963, art 1, § 20, preventing interference with the jury is undoubtedly an overriding interest. The trial court thus was justified in attempting to safeguard that interest.

13

However, the trial court failed to comply with the remainder of the requirements set forth in *Vaughn* and *Waller*. First, the closure was broader than necessary to protect the impartiality of the jury. See *Waller*, 467 US at 48. The trial court could have banned only Frye from the courtroom, given that no other member of the public attempted to interact with the jury. It could have repeated its previous instructions to observers regarding the prohibition on juror interaction or given more detailed instructions. Or it could have had the deputy escort the jury to and from the courtroom to prevent any potential interaction with members of the public. Any of these alternatives on their own or in combination would have safeguarded the jury's impartiality while still maintaining a public trial under the circumstances of this case.

Second, the trial court failed to consider reasonable alternatives to closing the proceeding. See *id*. As discussed, there were several alternatives to closure available to the trial court. But the trial court considered only the option of holding Frye in contempt of court.

Third, the trial court also failed to make adequate factual findings to support the closure. See *id*. The trial court did not find that Frye's interaction with the juror was for the purpose of interfering with court proceedings or tampering with the jury. It did not find that the result of Frye's interaction with the juror was a biased juror. And it did not find that a closure was necessary to protect the impartiality of the jury. To the contrary, the trial court concluded that it was unnecessary to question the jurors to determine whether any were prejudiced by Frye's interaction with the juror because it was merely a "short comment." Without factual findings to support its conclusion, the trial court's decision to close the courtroom was unjustified.

14

The trial court's failure to comply with the requirements set forth in *Vaughn* and *Waller* constituted error. We also conclude that the error was plain, as these requirements are well established and the trial court's failure to comply with them is readily apparent from the record. See *Carines*, 460 Mich at 763.

b. THE ERROR AFFECTED DEFENDANT'S SUBSTANTIAL RIGHTS

Having found that plain error occurred, we must now consider whether the plain error affected defendant's substantial rights. See *id*. This prong of the plain-error analysis is typically satisfied by demonstrating that the plain error likely affected the outcome of the trial court proceedings. See *Olano*, 507 US at 734; *Carines*, 460 Mich at 763. We readily apply that standard in the context of nonstructural error—for example, by concluding that wrongly admitted evidence likely caused the jury to reach a guilty verdict. See *Fulminante*, 499 US at 307-308. But this prong presents special difficulty when presented with a structural error. Because structural errors by definition "affect[] the framework within which the trial proceeds" rather than a single piece of evidence or aspect of the trial, the harm rendered by structural errors is substantial but often difficult to quantify. *Id*. at 310. Given these difficulties, structural errors are particularly ill-suited to an analysis of whether the error affected the outcome of the trial court proceedings.

The United States Supreme Court faced similar difficulty in the context of applying the harmless-error standard to preserved structural errors. Generally, preserved errors are subject to the harmless-error rule, under which a defendant is denied relief only if the complained-of error was harmless beyond a reasonable doubt. *Chapman v California*, 386 US 18, 24; 87 S Ct 824; 17 L Ed 2d 705 (1967); *Carines*, 460 Mich at 774. But when faced

15

with applying this prejudice standard to preserved structural errors, the Court was met with the same difficulties we described earlier; specifically, that errors in the framework of the trial cause serious, but usually unquantifiable harm. *Fulminante*, 499 US at 289-290. The Court ultimately determined that these structural errors involved "constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error," *Chapman*, 386 US at 23, and held that the proper remedy for a preserved structural error is automatic reversal, *Fulminante*, 499 US at 309.

This Court has previously suggested that structural errors satisfy the third prong of the plain-error standard. See *Vaughn*, 491 Mich at 666; see also *Cain*, 498 Mich 108, 145; 869 NW2d 829 (2015) (VIVIANO, J., dissenting) (advocating for this Court to expressly recognize that structural errors satisfy the third prong). The harmless-error and plain-error standards require "the same kind of inquiry," because they both require appellate courts to assess the effect of the error on the outcome of the trial court proceedings. *Olano*, 507 US at 734. Accordingly, just as preserved structural errors "defy analysis by 'harmless-error' standards," *Fulminante*, 499 US at 309, we conclude that forfeited structural errors defy analysis under the third prong of the plain-error standard. Just as the United States Supreme Court jettisoned the prejudice analysis for preserved structural errors, we similarly jettison the prejudice analysis for forfeited structural errors. Instead, we hold that because structural errors often "render a trial fundamentally unfair" and an "unreliable vehicle for determining guilt or innocence," *Neder v United States*, 527 US 1, 8-9; 119 S Ct 1827; 144 L Ed 2d 35 (1999) (quotation marks and citations omitted),[11] and affect the framework

---

[11] Although the United States Supreme Court in *Weaver* reasoned that "not every public-trial violation will in fact lead to a fundamentally unfair trial," the Court continued to

16

within which the trial proceeds, *Fulminante*, 499 US at 310, they necessarily affect a defendant's substantial rights.[12]  Accordingly, the existence of a forfeited structural error alone satisfies the third prong of the plain-error standard, and a defendant need not also show the occurrence of outcome-determinative prejudice.[13]  As applied here, because the deprivation of the public-trial right is a structural error, defendant has satisfied the third prong of the plain-error standard.  *Vaughn*, 491 Mich at 666; *Weaver*, 582 US at ___; 137 S Ct at 1908.

### c.  REVERSAL IS WARRANTED

We must now consider whether "the plain, forfeited error . . . seriously affected the fairness, integrity or public reputation of judicial proceedings independent of the

---

recognize that some structural errors do always result in fundamental unfairness, "either to the defendant in the specific case or by pervasive undermining of the systematic requirements of a fair and open judicial process."  *Weaver*, 582 US at ___; 137 S Ct at 1911.  In the specific context of the public-trial right, the Court further recognized that its violation *may* result in fundamental unfairness, that the harm rendered by such a violation is difficult to quantify, and that the public-trial right protects interests of people beyond the defendant.  *Id*. at ___; 137 S Ct at 1910.  Although the violation of the public-trial right may not always result in fundamental unfairness, it does affect the framework within which the trial proceeds, and the harm rendered is sufficiently significant to support our conclusion that violation of this right necessarily affects a defendant's substantial rights.

[12] This holding is consistent with the United States Supreme Court's decision in *Olano*, 507 US at 735, in which the Court suggested, but did not affirmatively hold, that forfeited structural errors may constitute "a special category of forfeited errors that can be corrected regardless of their effect on the outcome" of the trial court proceedings.

[13] In so doing, we join multiple federal circuits who have held similarly.  See *United States v Adams*, 252 F3d 276, 285-286 (CA 3, 2001); *United States v Ramirez-Castillo*, 748 F3d 205, 215 (CA 4, 2014); *Robinson v Ignacio*, 360 F3d 1044, 1061 (CA 9, 2004).

17

defendant's innocence." *Carines*, 460 Mich at 763 (quotation marks, citation, and brackets omitted).[14]

We take this opportunity to hold that a forfeited structural error creates a formal presumption that this prong of the plain-error standard has been satisfied.[15] "[T]here is substantial overlap between the characteristics of structural errors (i.e., they 'necessarily render a trial fundamentally unfair') and the standard under the fourth *Carines* prong ('serious effect on the fairness, integrity, or public reputation of the proceedings')." *Cain*, 498 Mich at 148 (VIVIANO, J., dissenting). A trial that has been rendered fundamentally unfair or had its framework affected by structural error is generally one whose fairness, integrity, or public reputation has been damaged. See *Vaughn*, 491 Mich at 667 (reasoning that "any error that is structural is likely to have *an* effect on the fairness, integrity or public reputation of judicial proceedings") (quotation marks and citation omitted); *United States v Recio*, 371 F3d 1093, 1103 n 7 (CA 9, 2004) ("We note that structural error is particularly likely to satisfy [the] fourth prong [of the plain-error standard]."). Given this conceptual overlap between the third and fourth prongs of the plain-error standard and that a forfeited

---

[14] Defendant does not argue that the error resulted in the conviction of an actually innocent defendant.

[15] The concurrence asserts that this part of our holding is a sua sponte modification of the law. We disagree. Defendant prompted us to take this approach as a responsive suggestion to the part of our order that asked the parties whether a plain error occurred below. *Davis*, 507 Mich 853. Given that this modification of the prior plain-error standard was made at a party's prompting, we do not view this as a sua sponte change to the law. See, e.g., *Black's Law Dictionary* (11th ed) (defining "sua sponte" as "[w]ithout prompting or suggestion; on [the court's] own motion").

18

structural error automatically satisfies the third prong of the plain-error standard, a forfeited structural error is very likely to also satisfy the fourth prong of the plain-error test.

Recognizing a formal rebuttable presumption creates a better framework for future courts applying the plain-error standard to forfeited structural errors. Just as defendants face difficulty in proving prejudice from structural errors, they also face difficulty in identifying specific facts on the record showing that the forfeited structural error seriously affected the fairness, integrity, or public reputation of the trial. The formal rebuttable presumption in cases of forfeited structural error will shift the burden to the prosecutor to demonstrate that the error did not seriously affect the fairness, integrity, or public reputation of the judicial proceeding. The prosecutor is better positioned to marshal record facts supporting the overall fairness of the trial proceedings. For example, in the context of courtroom closures, a prosecutor may successfully rebut the presumption when the trial court failed to sufficiently articulate the basis for the closure under *Waller*, but sufficient justification for the specific closure was present elsewhere in the record. A prosecutor may also successfully rebut such a presumption when an unjustified closure was limited and the courtroom remained open during most of the critical stages of trial. In those hypothetical situations, specific facts could affirmatively demonstrate that, despite the error, the overall fairness, integrity, and reputation of the trial court proceedings were preserved.[16]

---

[16] The ability to rebut this presumption is consistent with our historical differentiation between preserved and unpreserved errors. "This Court disfavors consideration of unpreserved claims of error," and the mere occurrence of error is insufficient for relief if the defendant failed to object to the error in the trial court. *Carines*, 460 Mich at 761-762. Enforcing a higher standard to achieve relief for unpreserved error encourages defendants to identify error at trial, as the trial court is "ordinarily in the best position to determine the relevant facts and adjudicate the dispute," and resolution at the trial court level prohibits

As applied in the present case, the denial of defendant's public-trial right—as a structural error—presumptively establishes that the error had a serious effect on the fairness, integrity, or public reputation of the trial, and the prosecutor has not rebutted this presumption. The prosecutor, with whom the Court of Appeals agreed, argues that this prong is not satisfied because the closure "reduced the perception that the gallery was pro-victim and against defendant, and it made less glaring the fact that no one was there who supported defendant." *Davis*, 331 Mich App at 716. But the public-trial right does not serve only defendant's interest in the presence of community support. The existence of public observers, no matter their affiliation, helps to ensure a fair trial, to ensure that attorneys and judges do their jobs responsibly, to encourage witnesses to come forward, and to discourage perjury. *Vaughn*, 491 Mich at 667. Further, this focus on the supposed absence of harm to defendant himself fails to consider the harm rendered to the integrity and public reputation of the trial. While we agree with the prosecutor that jurors are presumed to follow their instructions and that the jurors in this case were instructed to base their decisions on the evidence, that alone is not enough to rebut the presumption where

_____

the defendant from using the alleged error as an appellate parachute. *Puckett v United States*, 556 US 129, 134; 129 S Ct 1423; 173 L Ed 2d 266 (2009). Here, although the fundamental and unquantifiable harm rendered by forfeited structural errors is sufficient to satisfy the third prong of the plain-error standard and presumptively satisfy the fourth, the prosecutor's ability to rebut the latter presumption means that the defendant is not guaranteed relief for a forfeited structural error. Accordingly, defendants remain encouraged to object to structural errors at the trial court, where the trial court may contemporaneously cure the error, or, upon appeal, the defendant will receive automatic relief. Those defendants who forfeit their argument continue to face a higher threshold for relief on appeal than those who preserved their argument. Under these circumstances, we find unlikely the concurrence's concern that litigants will strategically choose not to object to potential structural error in order to harbor that error as an appellate parachute.

the vast majority of the critical parts of this trial occurred behind closed doors.[17]  Therefore, we hold that the prosecutor has failed to rebut the presumption that the deprivation of defendant's public-trial right had a serious effect on the fairness, integrity, or public reputation of the trial.  Having satisfied the plain-error standard, defendant is entitled to relief.

## III.  CONCLUSION

The trial court's closure of the courtroom for nearly the entirety of trial after a single, benign interaction between an observer and a juror constituted plain error.  Because the deprivation of a defendant's public-trial right is a structural error, it necessarily affected defendant's substantial rights.  This structural error presumptively satisfies the plain-error standard's requirements for reversal, and here, neither the prosecutor's arguments nor the record evidence rebuts that presumption.  Accordingly, we reverse the Court of Appeals judgment and remand to the trial court for a new trial.

> Elizabeth T. Clement
> Bridget M. McCormack
> David F. Viviano
> Richard H. Bernstein
> Megan K. Cavanagh
> Elizabeth M. Welch

---

[17] While the courtroom was closed in this case, "the jury heard the testimony of 14 witnesses, 13 of whom testified for the prosecution.  Counsel then presented their closing arguments, the trial court instructed the jury, and the jury returned its verdict—all in private." *Davis*, 331 Mich App at 724 (SWARTZLE, P.J., concurring in part and dissenting in part).  "If a portion of the trial may be conducted behind barred doors, it may all be conducted behind barred doors.  If one constitutional right may be violated with impunity, all may be and the bill of rights becomes but a scrap of paper.  The defendant has not had the public trial guaranteed him by the Constitution." *People v Micalizzi*, 223 Mich 580, 585; 194 NW 540 (1925).

STATE OF MICHIGAN

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

       Plaintiff-Appellee,

v                                     No. 161396

DONALD WAYNE DAVIS, JR.,

       Defendant-Appellant.

_____

ZAHRA, J. (*concurring in the result*).

I concur with the majority opinion that the closure of the courtroom for the majority of defendant's trial violated his constitutional right to a public trial and amounted to plain structural error warranting reversal. I disagree, however, with this Court's sua sponte decision to modify the existing plain-error standard of review adopted by this Court in *People v Carines*[1] for reviewing unpreserved structural errors. With no warning to the bench and the bar, the majority opinion opportunistically concludes that structural errors defy plain-error review and that the prosecution must bear the burden of proving that an unpreserved structural error did not result in the conviction of an actually innocent defendant or seriously affect the fairness, integrity, or public reputation of a defendant's trial so as to warrant reversal—notwithstanding this Court's prior precedent rejecting such a rule. The majority opinion's newfound framework erodes the preservation standard in this state by undermining the very reasons for which we require errors to be preserved for

---

[1] *People v Carines*, 460 Mich 750, 763-764; 597 NW2d 130 (1999).

appellate review—to allow trial courts the opportunity to correct the error, to prevent the administrative and social costs of further proceedings that could have been avoided with a timely objection, and to deter defendants and their counsel from harboring error as an appellate parachute. Further still, the majority opinion casts aside our jurisprudence without any apparent need to do so in this case. That is, because defendant can demonstrate that he is entitled to a reversal under all four prongs of the current plain-error standard, this Court fashions a rule it need not even apply to afford defendant relief. Accordingly, while I concur in the result reached by the majority opinion, I very much disagree with its reasoning.

## I. THE PLAIN-ERROR STANDARD

Time and again, this Court has emphasized " ' "the importance of preserving issues for appellate review" ' " and expressed its disfavor of considering " ' "unpreserved claims of error," even unpreserved claims of constitutional error.' "[2] "As a general rule, appellate courts will not grant relief on belated claims of error unless *the proponent* establishes, among other things, that the unpreserved error seriously affected the fairness, integrity, or public reputation of the judicial proceedings."[3] This general rule exists for good reason: " ' "[A]nyone familiar with the work of courts understands that errors are a constant in the trial process, that most do not much matter, and that a reflexive inclination by appellate

---

[2] *People v Cain*, 498 Mich 108, 115; 869 NW2d 829 (2015), quoting *People v Vaughn*, 491 Mich 642, 653-654; 821 NW2d 288 (2012). See also *Carines*, 460 Mich at 761-762, citing *People v Grant*, 445 Mich 535; 520 NW2d 123 (1994).

[3] *Cain*, 498 Mich at 112 (emphasis added).

courts to reverse because of unpreserved error would be fatal." ' "[4] "Preservation serves 'the important need to encourage all trial participants to seek a fair and accurate trial the first time around[.]' "[5]

It is with this basic understanding of appellate law that this Court in *Carines* adopted the plain-error standard set forth by the Supreme Court of the United States in *United States v Olano* for forfeited constitutional errors.[6] "[I]n order to receive relief on his forfeited claim of constitutional error, *defendant* must establish (1) that the error occurred, (2) that the error was plain, (3) that the error affected substantial rights, and (4) that the error either resulted in the conviction of an actually innocent defendant or seriously affected the fairness, integrity, or public reputation of judicial proceedings."[7] Although the third prong generally requires a defendant to establish "prejudice," i.e., that the error affected the outcome of the proceedings, there exists a special "category of cases, yet to be clearly defined, where prejudice is presumed or reversal is automatic."[8] Errors in these cases are referred to as "structural errors" because "they 'affect the framework within which the trial

---

[4] *Id*. at 115, quoting *Puckett v United States*, 556 US 129, 134; 129 S Ct 1423; 173 L Ed 2d 266 (2009).

[5] *People v Pipes*, 475 Mich 267, 277; 715 NW2d 290 (2006), quoting *Grant*, 445 Mich at 551.

[6] *Carines*, 460 Mich at 763-764, citing *United States v Olano*, 507 US 725; 113 S Ct 1770; 123 L Ed 2d 508 (1993).

[7] *Vaughn*, 491 Mich at 664-665 (quotation marks omitted; emphasis added), citing *Carines*, 460 Mich at 763.

[8] *Vaughn*, 491 Mich at 666 (quotation marks and citation omitted).

3

proceeds' and are not 'simply an error in the trial process itself.' "[9] As we stated in *People v Vaughn*, another case involving an unpreserved claim of error regarding a defendant's right to a public trial:

> While the Supreme Court of the United States has specifically reserved judgment on whether an unpreserved structural error automatically affects a defendant's substantial rights, this Court's decision in *People v Duncan*[10] has explained that structural errors are intrinsically harmful, without regard to their effect on the outcome. Accordingly, our caselaw suggests that a plain structural error satisfies the third *Carines* prong.
>
> Nevertheless, even if defendant can show that the error satisfied the first three *Carines* requirements, we must exercise discretion and only grant defendant a new trial if the error resulted in the conviction of an actually innocent defendant or seriously affected the fairness, integrity, or public reputation of judicial proceedings. Although denial of the right to a public trial is a structural error, it is still subject to this requirement. While any error that is structural is likely to have *an* effect on the fairness, integrity or public reputation of judicial proceedings, the plain-error analysis requires us to consider whether an error *seriously* affected those factors.[11]

In *People v Cain*, this Court reaffirmed *Vaughn*'s holding that even with respect to unpreserved structural errors, "a defendant is still not entitled to relief unless he or she can

---

[9] *United States v Gonzalez-Lopez*, 548 US 140, 148; 126 S Ct 2557; 165 L Ed 2d 409 (2006) (brackets omitted), quoting *Arizona v Fulminante*, 499 US 279, 309-310; 111 S Ct 1246; 113 L Ed 2d 302 (1991). Structural errors are distinguishable from "trial error[s]," which are errors that "occur[] during presentation of the case to the jury" and "may be quantitatively assessed in the context of other evidence presented in order to determine whether [they are] harmless beyond a reasonable doubt." *Gonzalez-Lopez*, 548 US at 148 (quotation marks and citation omitted).

[10] *People v Duncan*, 462 Mich 47, 51; 610 NW2d 551 (2000).

[11] *Vaughn*, 491 Mich at 666-667 (quotation marks, citations, and ellipses omitted).

4

satisfy the four requirements set forth in *Carines*."[12]  "While meeting all four prongs is difficult, as it should be, the plain-error test affords defendants sufficient protection because . . . [a]pplication of a plain-error analysis to unpreserved structural error does not deny that error close consideration . . . ."[13]  Reviewing courts must " 'consider carefully whether any forfeited error either resulted in the conviction of an actually innocent defendant or seriously affected the fairness, integrity, or public reputation of judicial proceedings.' "[14]  "[T]he fourth *Carines* prong is meant to be applied on a case-specific and fact-intensive basis."[15]

## II.  PROBLEMS WITH THE MAJORITY OPINION'S FRAMEWORK

Rather than follow the traditional plain-error framework outlined in *Carines* and applied in *Vaughn*, the majority opinion carves out an exception for unpreserved structural errors.  The Court concludes that all structural errors defy the third prong of *Carines* because they render a trial fundamentally unfair, undermine the reliability of the guilt-determining process, and affect the framework within which the trial proceeds.  As to the fourth *Carines* prong, the majority opinion shifts the burden to the prosecution to show why the forfeited structural error did not result in the conviction of an actually innocent defendant or seriously affect the fairness, integrity, and public reputation of defendant's trial.  I discern a number of problems with the Court's newfound framework.

[12] *Cain*, 498 Mich at 116.

[13] *Id*. (quotation marks, citations, and brackets omitted).

[14] *Id*. at 116-117, quoting *Vaughn*, 491 Mich at 655 n 42.

[15] *Id*. at 121.

As an initial matter, I am troubled by this Court's sua sponte decision to modify the current plain-error standard with absolutely no notice to the bench and the bar. Nothing in this Court's order for supplemental briefing even hinted at the notion that this Court was considering altering our traditional framework, nor did our order invite traditional interest groups, such as the Prosecuting Attorneys Association of Michigan, to file briefs amicus curiae.[16] Also, defendant did not request such a change in the law in his application for leave to appeal. Instead, defendant's supplemental brief advocates for this new standard in the alternative; that is, only if this Court concludes that defendant cannot satisfy his burden under all four *Carines* prongs. By adopting a new standard of appellate review for unpreserved structural errors without notice to the bench and the bar, this Court deprives interested parties from weighing in on this jurisprudentially significant issue, which has far-reaching ramifications in our state's criminal law jurisprudence.

These prudential concerns are particularly heightened considering that the majority opinion goes further than the Supreme Court of the United States or this Court has previously been willing to go. "Despite its name, the term 'structural error' carries with it no talismanic significance as a doctrinal matter. It means *only* that the government is not entitled to deprive the defendant of a new trial by showing that the error was *harmless beyond a reasonable doubt*."[17] As we stated in *Vaughn*, the Supreme Court of the United States "has expressly distinguished plain-error analysis from harmless-error analysis" by

---

[16] See *People v Davis*, 507 Mich 853 (2021).

[17] *Weaver v Massachusetts*, 582 US ___, ___; 137 S Ct 1899, 1910; 198 L Ed 2d 420 (2017) (quotation marks and citation omitted; emphasis added).

6

"repeatedly with[holding] judgment on whether a structural error automatically satisfies the third prong of plain-error analysis, implying that structural errors do not entirely defy plain-error analysis, even if they do defy harmless-error analysis."[18] We also explained in *Vaughn* that the Supreme Court's decision in *Johnson v United States* "rejected the argument that *Olano* does not apply to a claimed structural error because it had 'no authority' to create 'out of whole cloth' an exception to the traditional forfeiture analysis simply because the claimed error was structural."[19] By concluding that all unpreserved structural errors defy the traditional plain-error framework, automatically satisfy the third *Carines* prong, and presumptively satisfy the fourth *Carines* prong, the majority opinion breaks new ground with little discussion of this Court's previous concerns about keeping harmless-error review and plain-error review conceptually separate.

Further, this Court in *Cain* specifically rejected the majority opinion's new burden-shifting framework, stating:

> The dissent's theory that the structural nature of the error presumptively establishes the fourth prong is inconsistent with this Court's recent holding in *Vaughn*, that even with regards to a structural error, a defendant is not entitled to relief unless he can establish that the error seriously affected the fairness, integrity, or public reputation of judicial proceedings and that while any error that is structural is likely to have *an* effect on the fairness, integrity or public reputation of judicial proceedings, the plain-error analysis requires us to consider whether an error *seriously* affected those factors.[20]

---

[18] *Vaughn*, 491 Mich at 656 n 42 (emphasis omitted), citing *Puckett*, 556 US at 140.

[19] *Id*. at 655, quoting *Johnson v United States*, 520 US 461, 466; 117 S Ct 1544; 137 L Ed 2d 718 (1997).

[20] *Cain*, 498 Mich at 118 n 4 (quotation marks, citations, and ellipses omitted). Although the majority opinion recognizes that "not every public-trial violation will in fact lead to a fundamentally unfair trial," *Weaver*, 582 US at ___; 137 S Ct at 1911, it fails to give due

7

This Court now adopts the dissent's theory in *Cain* and overrules *Vaughn*'s application of the plain-error standard for unpreserved structural errors without any mention of the doctrine of stare decisis.[21]

---

weight to this principle in its articulation of its rebuttable presumption under the fourth *Carines* prong. The majority states that "[t]here is substantial overlap between the characteristics of structural errors (i.e., they *necessarily render a trial fundamentally unfair*) and the standard under the fourth *Carines* prong (serious effect on the fairness, integrity, or public reputation of the proceedings)." *Ante* at 18 (quotation marks and citation omitted; emphasis added). However, "[a]n error can count as structural even if the error does not lead to fundamental unfairness in every case." *Weaver*, 582 US at ___; 137 S Ct at 1908; see also *Gonzalez-Lopez*, 548 US at 149 n 4 (rejecting the notion that "fundamental unfairness" is the sole criterion of structural error and stating that structural errors do not "*always* or *necessarily* render a trial fundamentally unfair and unreliable"). Indeed, we recognized in *Vaughn* that "[t]he right to a public trial is of a different order because the violation of that right does not necessarily affect qualitatively the guilt-determining process or the defendant's ability to participate in the process." *Vaughn*, 491 Mich at 657 (quotation marks and citation omitted). Therefore, while there may be some overlap between the characteristics of structural error and the "fairness" principles encompassed in the fourth *Carines* prong, this will not always be the case, as there are other considerations unrelated to the fairness or reliability of the proceedings that can contribute to an error being labeled "structural" such that it defies harmless-error analysis. See *Weaver*, 582 US at ___; 137 S Ct at 1908-1910 (explaining that there are at least three broad, nonexclusive rationales for why an error may be deemed "structural"—(1) "if the right at issue is not designed to protect the defendant from erroneous conviction but instead protects some other interest"; (2) "if the effects of the error are simply too hard to measure"; or (3) "if the error always results in fundamental unfairness"—and that public-trial violations have characteristics of all three).

[21] *People v Feezel*, 486 Mich 184, 212; 783 NW2d 67 (2010) ("Deciding to overrule precedent is not a decision that this Court takes lightly. Indeed, this Court should respect precedent and not overrule or modify it unless there is substantial justification for doing so."). See *Robinson v Detroit*, 462 Mich 439, 464; 613 NW2d 307 (2000) (establishing a three-part test to determine whether to depart from stare decisis).

The majority opinion's new framework also largely ignores the broader teachings of the United States Supreme Court's recent decision in *Weaver v Massachusetts*.[22] The issue in *Weaver* was whether the burden of proving prejudice for an unpreserved public-trial violation changed when the defendant raised that claim of structural error on collateral review via an ineffective-assistance-of-counsel claim rather than on direct review.[23] The Court ultimately concluded that the burden remained on the defendant to show prejudice under either the traditional ineffective-assistance-of-counsel standard articulated in *Strickland v Washington* (i.e., " 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different' "), or a less " 'mechanical' " framework that focused on " 'the fundamental fairness of the proceeding' " (i.e., that the attorney's error rendered the defendant's trial fundamentally unfair).[24] Particularly relevant is the Court's discussion as to why placing the burden on the defendant, who failed to preserve the claimed error on direct appeal, was appropriate:

> The reason for placing the burden on the [defendant] in this case . . . derives both from the nature of the error and the difference between a public-trial violation *preserved* and then raised on direct review and a public-trial violation raised as an ineffective-assistance-of-counsel claim. . . .

---

[22] *Weaver*, 582 US ___; 137 S Ct 1899.

[23] *Id*. at ___; 137 S Ct at 1905.

[24] *Id*. at ___; 137 S Ct at 1911, quoting *Strickland v Washington*, 466 US 668, 694, 696; 104 S Ct 2052; 80 L Ed 2d 674 (1984). The Court in *Weaver* accepted, "for analytical purposes," the defendant's argument "that under a proper interpretation of *Strickland*, even if there is no showing of a reasonable probability of a different outcome, relief still must be granted if the convicted person shows that attorney errors rendered the trial fundamentally unfair." *Weaver*, 582 US at ___; 137 S Ct at 1911. The Court ultimately deemed it unnecessary to decide whether the defendant's interpretation of *Strickland* was correct.

[W]hen a defendant objects to a courtroom closure, the trial court can either order the courtroom opened or explain the reasons for keeping it closed. When a defendant first raises the closure in an ineffective-assistance claim, however, the trial court is deprived of the chance to cure the violation either by opening the courtroom or by explaining the reasons for closure.

Furthermore, when state or federal courts adjudicate errors *objected to during trial* and then raised on direct review, the systemic costs of remedying the error are diminished to some extent. That is because, if a new trial is ordered on direct review, there may be a reasonable chance that not too much time will have elapsed for witness memories still to be accurate and physical evidence not to be lost. . . .

* * *

In sum, "an ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial," thus undermining the finality of jury verdicts.[25]

In this way, the majority opinion's burden-shifting framework for unpreserved structural errors subverts the many reasons we require litigants to preserve their claims of error for appellate review. Requiring litigants to preserve their claims of error with a contemporaneous objection provides trial courts the opportunity to correct the error, thereby obviating the need for further proceedings and avoiding the costs of new trials that could have been rendered unnecessary by timely objections.[26] " 'And of course the

---

[25] *Id*. at ___; 137 S Ct at 1912 (brackets omitted; emphasis added), quoting *Harrington v Richter*, 562 US 86, 105; 131 S Ct 770; 178 L Ed 2d 624 (2011).

[26] *Cain*, 498 Mich at 114; *Grant*, 445 Mich at 551 (" 'The reversal of a conviction entails substantial social costs: it forces jurors, witnesses, courts, the prosecution, and the defendants to expend further time, energy, and other resources to repeat a trial that has already once taken place; victims may be asked to relive their disturbing experiences. The passage of time, erosion of memory, and dispersion of witnesses may render retrial difficult, even impossible. Thus, while reversal may, in theory, entitle the defendant only to retrial, in practice it may reward the accused with complete freedom from prosecution, and thereby cost the society the right to punish admitted offenders.' ") (quotation marks

10

contemporaneous-objection rule prevents a litigant from "sandbagging" the court—remaining silent about his objection and belatedly raising the error only if the case does not conclude in his favor.' "[27]  Indeed, this case illustrates the precise problem with the Court's new rule.  Not only did defendant not object to the closure, but defense counsel testified at the postconviction evidentiary hearing that his decision not to object was intentional and that he believed the courtroom closure inured to defendant's benefit by decreasing the number of supporters on the victim's side of the courtroom.  Also, although not argued by the prosecution, defense counsel appeared to express some level of agreement with the trial court's decision to close the courtroom.  At the time the trial court ordered the courtroom closed, the following exchange occurred:

> *The Court*: . . . Who is in the gallery that works at Hurley Hospital? . . .
>
> *     *     *
>
> *Member of the gallery*:  I work there.
>
> *     *     *
>
> *The Court*:  Where do you work at Hurley Hospital?
>
> *Member of the gallery*:  Housekeeping.  Environmental Services.
>
> *The Court*:  And are you here watching this trial why?
>
> *     *     *
>
> *Member of the gallery*:  Because [the victim] was my kid's father.

---

and brackets omitted), quoting *United States v Mechanik*, 475 US 66, 72; 106 S Ct 938; 89 L Ed 2d 50 (1986).

[27] *Cain*, 498 Mich at 115, quoting *Puckett*, 556 US at 134 (quotation marks omitted).

*The Court*: So you know, counselors, the jury has complained that that woman has tried to talk to them.

*Member of the gallery*: No. I didn't try to talk. I just saw a lady and I asked[,] . . . do you work at Hurley's? I know I'm not supposed to talk to them.

*The Court*: I've got two choices. One is to find you in contempt of court and lock you up.

\* \* \*

. . . The other is to order everyone in the gallery to leave the courthouse and not come back. . . . I'm going to bar everyone from this courthouse except for the mother of [the victim]. The rest of you leave. Don't come back.

*Member of the gallery*: Okay.

*The Court*: Shame on you trying to subvert the justice system.

\* \* \*

*The Court*: The only person allowed to watch this trial is the mother of the young man who died. What foolishness.

[*Defense Counsel*]: Your Honor, may we approach?

*The Court*: Yes. Do you want this on the record or off the record?

[*The Prosecutor*]: It probably should be on because I think it's for both of our benefit here.

*The Court*: Okay.

[*The Prosecutor*]: Do you want to have the jurors who have a complaint to come in to double check to make sure that there has been no comment that has been made that's go[ing to] prejudice the—anything?

*The Court*: No.

[*The Prosecutor*]: Okay. Fair enough.

*The Court*: No. It was a short comment. What she asked one juror was, do you work at Hurley Hospital[?]

[*The Prosecutor*]:  Okay.  So, there's nothing about the case itself that was implicated?

*The Court*:  Right.

[*Defense Counsel*]:  Well it's still enough to . . . cause some concerns, but I guess you worked it out.  I understand why the concern (inaudible).

*The Court*:  Sure.

[*The Prosecutor*]:  It's up to you.  Do you want him—are you okay with it?

[*Defense Counsel*]:  (inaudible) with the Judge's decision.

[*The Prosecutor*]:  I don't have a need for a hearing if that's all that was said.

*The Court*:  I don't think it's necessary.

[*The Prosecutor*]:  Okay.  Thank you.

*The Court*:  I don't want to make the jury nervous.  Now we'll bring the jury out.

Admittedly, the record is cryptic and difficult to discern.  Nonetheless, defense counsel's statement that the trial court "worked it out" can arguably be interpreted as an express approval of the courtroom closure, particularly when coupled with counsel's later testimony that his decision not to object was intentional.  These facts make it a close question as to whether defendant waived, rather than forfeited, his claim that his right to a public trial was violated.[28]  Had the record been developed on this point, the result here could have been very different.  In any event, accepting the notion that the underlying record is so unclear it cannot establish that defendant waived this claim of error, I seriously

---

[28] See *Olano*, 507 US at 733 ("Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the intentional relinquishment or abandonment of a known right.") (quotation marks and citation omitted).

13

question the logic behind shifting the burden of proving the fourth *Carines* prong to the prosecution when, under these circumstances, the record is crystal clear that defense counsel *intentionally* did not object to the closure. This case presents a classic example in which silent acquiescence to an erroneous decision leads to the litigant "sandbagging" the court and harboring error—which is significant enough to be deemed "structural"—as an appellate parachute.[29]

Finally, this Court's sua sponte modification of the plain-error standard for unpreserved structural errors is completely unnecessary in this case because defendant can satisfy the current standard. As the majority opinion concludes, the trial court was certainly justified in taking some action in response to the prohibited interaction between the mother of the victim's child and the juror. But the court's closure of the courtroom to everyone except the victim's mother for the remainder of defendant's trial was overbroad, and the court failed to consider other reasonable alternatives in lieu of closing the courtroom.[30]

---

[29] The majority opinion also contends that recognizing a rebuttable presumption that shifts the burden of proving the fourth *Carines* prong to the prosecution is appropriate because the prosecution "is better positioned to marshal record facts supporting the overall fairness of the trial proceedings." *Ante* at 19. Not only is this reasoning unfounded, it ignores the fact that the burden was on defendant to object in the first place.

[30] Although the majority opinion applies the test articulated in *Waller v Georgia*, 467 US 39, 48; 104 S Ct 2210; 81 L Ed 2d 31 (1984), for complete closures, I agree with the prosecution that the courtroom was only partially closed. "[A] total closure involves excluding all persons from the courtroom for some period while a partial closure involves excluding one or more, but not all, individuals for some period." *United States v Simmons*, 797 F3d 409, 413 (CA 6, 2015). See also *People v Kline*, 197 Mich App 165, 170 n 2; 494 NW2d 756 (1992) ("A partial closure occurs where the public is only partially excluded, such as when family members or the press are allowed to remain . . . ."). "Whether a closure is total or partial depends not on how long a trial is closed, but rather who is excluded during the period of time in question." *Simmons*, 797 F3d at 413 (quotation marks, citation, and ellipsis omitted). Here, the court's closure order did not preclude *all*

14

Thus, the violation of defendant's right to a public trial amounted to plain structural error. And given this Court's decision in *Vaughn*, this type of structural error satisfies the third prong of *Carines*.[31] Further, defendant has shown that the closure here seriously affected the fairness, integrity, and public reputation of his trial. During the closure, 14 witnesses testified, including the prosecution's star witness, whose testimony implicated defendant in the murder; the parties gave closing arguments; the trial court instructed the jury; and the jury rendered its verdict. This stands in marked contrast to the closure that occurred in *Vaughn*, in which the courtroom was closed only during voir dire; no witnesses testified during the closure; no objections were made to either party's peremptory challenges; each party was satisfied with the jury chosen; and the venire represented the public.[32] Here, the

members of the public from attending the trial, as the victim's mother was notably excluded. Further, Bryan Wooten, a friend of defendant, testified at the postconviction evidentiary hearing that he entered the courtroom unencumbered and only left because of an ambiguous gesture given by defendant, not because of any state action by a court officer.

Although this Court has not distinguished between total and partial courtroom closures, courts that have made that distinction "modify the *Waller* test so that the 'overriding interest' requirement is replaced by requiring a showing of a 'substantial reason' for a partial closure, but the other three factors remain the same." *Simmons*, 797 F3d at 414 ("[U]nder the modified *Waller* test . . . , (1) a party seeking a partial closure of the courtroom during proceedings must show a 'substantial reason' for doing so that is likely to be prejudiced if no closure occurs; (2) the closure must be no broader than necessary or must be 'narrowly tailored'; (3) the trial court must consider reasonable alternatives to closing the proceeding; and (4) the trial court must make findings adequate to support the closure."). See also *Kline*, 197 Mich App at 170-171. Even applying this slightly more lenient standard, however, I conclude that the partial closure violated defendant's right to a public trial for the reasons discussed earlier.

[31] *Vaughn*, 491 Mich at 666.

[32] *Id*. at 668-669.

15

courtroom was closed for the majority of defendant's trial and at critical points when the constitutional protections of a public trial are at their zenith.[33] Therefore, because defendant can satisfy all four prongs of the current plain-error standard articulated in *Carines*, there is no need for this Court to shift the burden to the prosecution to show why reversal is not appropriate.

## III. CONCLUSION

Until now, this Court has not wavered in its position that simply labeling an error as "structural" does not place it outside the strictures of the traditional plain-error standard. Unbothered by our precedent, this Court now casts that framework aside with respect to unpreserved structural errors in favor of a new burden-shifting framework that this Court has expressly rejected. For the reasons explained in this opinion, this change in the law is unwarranted. Accordingly, I concur in result only.

Brian K. Zahra

---

[33] *Id.* at 667 (The protections conferred by the Sixth Amendment right to a public trial "include (1) ensuring a fair trial, (2) reminding the prosecution and court of their responsibility to the accused and the importance of their functions, (3) encouraging witnesses to come forward, and (4) discouraging perjury.").